Kendall GLASS, Plaintiff–Appellant,

v.

Manuel MAYAS, M.D., personally, Celia Wong, M.D., personally, J.L. Inciong, M.D., personally, Anand Nadkarni, M.D., personally, Boris Dadic, M.D., personally, Rosalina Sarigumba, M.D., personally, Santokh Singh Ohson, M.D., personally, Dinesh K. Sood, M.D., personally, Defendants–Appellees.

No. 477, Docket 92–7673.

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1992.

Decided Jan. 15, 1993.

William M. Brooks, Huntington, NY, Mental Disability Law Clinic, Touro College, Jacob D. Fuchsberg Law Center (William Miller, Law Student Intern, of counsel), for plaintiff-appellant.

Robert K. Drinan, Asst. Atty. Gen., Mineola, NY (Robert Abrams, Atty. Gen. of the State of N.Y., of counsel), for defendants-appellees.

Before: MESKILL, Chief Judge, LUMBARD, and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

Kendall Glass appeals from a judgment of the Eastern District of New York, Platt, C.J., granting the defendants' motion for summary judgment on his claim pursuant to 42 U.S.C. § 1983 (1988) against several doctors and a nurse for violating his constitutional rights by involuntarily hospitalizing him for psychiatric care. Judge Platt ruled that the defendants were entitled to qualified immunity. 794 F.Supp. 470 (E.D.N.Y.1992). We affirm.

On June 23, 1989, the Nassau County police went to a boarding house in Massapequa, New York to investigate allegations from an unknown source that Glass was threatening another resident with a gun. Glass denied that he had a gun, and when the police were unable to find one, they left.

A week later, on June 30, the police received another complaint that Glass was threatening a resident with a gun. When the police and the Nassau County Medical

Center Crisis Team responded, they saw Glass digging around trees and a cesspool cover in a strange manner. Glass again denied having a gun; no gun was discovered.

Dr. Manuel Mayas and Celia Wong, R.N., members of the Crisis Team, observed and questioned Glass. They found him to be hostile, angry, uncooperative, and argumentative and diagnosed him as a chronic, paranoid schizophrenic. They also noted that he appeared unkempt. The Crisis Team then took Glass to the Nassau County Medical Center ("NCMC").

Dr. Mayas and Ms. Wong's screening/admission notes reflect Glass's extensive psychiatric history: his father committed suicide; his mother had been hospitalized for psychiatric care on numerous occasions; and Glass had been hospitalized for psychiatric care six times, most recently from April 1986 to February 1988. The notes also mention reports in Glass's file of past violent behavior. He had abused his mother, stabbed his brother three times during a fight, and ignited a propane tank in his home.

At the NCMC, Glass was examined by Dr. J.L. Inciong, who certified Glass for involuntary hospitalization pursuant to New York Mental Hygiene Law ("NYMHL") § 9.39 [1] on the basis of the reports concerning the gun, his digging activity, and his hostile and guarded attitude. Inciong's screening/admission notes also refer to Glass's psychiatric history, including his history of violence.

Glass was transferred to the Pilgrim Psychiatric Center where he was examined by Dr. Anand Nadkarni.[2] Based on Glass's threats to others, Dr. Nadkarni found that Glass manifested a tendency to cause harm to others, and he confirmed Dr. Inciong's decision to admit Glass.

On July 13, 1989, Dr. Boris Dadic, Glass's treating physician, applied for continued hospitalization of Glass pursuant to NYMHL § 9.27.[3] Dr. Dadic noted that Glass was a chronic schizophrenic and continued to display guarded, suspicious, and paranoid behavior. The application was also signed by Dr. Rosalina Sarigumba, who noted the accusation about the gun and observed that Glass was verbally abusive, suspicious, paranoid, and showed impaired judgment. She concluded that he was dangerous.

Drs. Santokh Singh Ohson and Dinesh K. Sood examined Glass and certified him for additional hospitalization pursuant to NYMHL § 9.27. Dr. Sood based his conclusion on the report that Glass had threatened someone with a gun, his suspicious, hostile, guarded, and angry attitude, and his incoherent and illogical speech. Dr. Ohson's conclusion was also based on the reported threats and on Glass's conduct.

On July 19, 1989, Glass requested a judicial hearing to challenge his confinement, as provided for by NYMHL § 9.31. A date was set, but numerous adjournments were granted, and the hearing never took place. The delays appear to have resulted from Glass's attempt to change attorneys. Glass was released from Pilgrim on September 29, 1989 after 91 days of confinement.

1. NYMHL § 9.39(a) allows for the emergency admission of a mentally ill person for fifteen days if a "person [is] alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or to others." The term "likelihood to result in serious harm" means a "substantial risk of physical harm to himself ... or other conduct demonstrating that he is dangerous to himself" or "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical danger." *Id.*

2. NYMHL § 9.39(a) forbids the detention of a person for involuntary treatment for more than forty-eight hours unless the initial finding is confirmed by another member of the hospital's psychiatric staff.

3. NYMHL § 9.27 provides that a patient can be retained for involuntarily treatment beyond 15 days if two physicians certify that the patient is "alleged to be mentally ill and in need of involuntary care and treatment." This section has been interpreted to require a finding that the patient poses a danger to himself or others. *Matter of Scopes v. Shah*, 59 A.D.2d 203, 398 N.Y.S.2d 911, 913 (3d Dep't 1977).

Glass brought this action in September 1990 claiming that his confinement violated (1) his right to due process because he did not satisfy the dangerousness requirement for involuntary hospitalization, and (2) his Fourth Amendment right to be free from unreasonable seizures because the defendants lacked probable cause to confine him. We agree with Judge Platt that the defendants were entitled to qualified immunity on both claims.

## A. *Due Process*

■ Qualified immunity protects government officials from the "costs of trial" and "broad reaching discovery" by shielding them from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738).

Determining the objective legal reasonableness of a specific action depends upon the level of generality with which applicable legal rules are defined. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. Thus, in the context of an illegal police search, the *Anderson* Court inquired "whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officer possessed." *Id.* at 641, 107 S.Ct. at 3040.

Glass claims that his involuntary commitment violated the Due Process Clause be-

cause he was not dangerous.[4] The Supreme Court has held that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members." *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). Accordingly, New York law has been interpreted to require a finding of dangerousness. *See Matter of Scopes v. Shah,* 59 A.D.2d 203, 398 N.Y.S.2d 911, 913 (3d Dep't 1977); *Project Release v. Prevost,* 722 F.2d 960, 973 (2d Cir.1983). Thus, the availability of qualified immunity turns on whether it was objectively reasonable for the defendants to believe, at the time they examined Glass and in light of the information that they possessed, that Glass was dangerous.

■ We agree with Judge Platt that the defendants' actions were objectively reasonable. Glass was hospitalized following two reports that he was threatening an individual with a gun and observations of strange behavior. Furthermore, his demeanor was variously described by those who examined him as hostile, guarded, angry, suspicious, uncooperative, and paranoid. Finally, he had an extensive psychiatric history, which included a history of violent behavior, multiple instances of hospitalization for psychiatric care, and a family history of mental illness.

We reject Glass's contention that the defendants acted unreasonably because they failed to ask him about specific events such as the digging around the cesspool. The defendants had considerable evidence of Glass's mental illness. They were aware of his psychiatric history. Mayas, Wong, and Inciong's notes reflected this history, and Sarigumba, Ohson, and Sood submitted uncontroverted affidavits which stated that they were aware of Glass's history. Moreover, Glass was hostile and uncooperative during the examinations. It was reasonable for the defendants to believe that questioning Glass about specific aspects of

---

**4.** Glass does not claim that the legal procedures required for his commitment were violated.

his conduct would not have aided them in their diagnosis.

### B. *Fourth Amendment*

Glass also alleges that his commitment violated the Fourth Amendment's prohibition against "unreasonable ... seizures" because the defendants lacked probable cause to believe he was dangerous.

 Glass was "seized" within the meaning of the Fourth Amendment. The Supreme Court has stated, "a 'seizure,' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.' " *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). The Crisis Team took Glass to the hospital against his will, and he was involuntarily confined there pursuant to state law. This infringement of his liberty was tantamount to the infringement of being arrested. *See Gooden v. Howard County, Md.,* 917 F.2d 1355, 1362 n. 3 (4th Cir.1992), *rev'd on other grounds,* 954 F.2d 960 (4th Cir.1992) (en banc). That his seizure occurred in the civil context does not render the Fourth Amendment inapplicable. *See Soldal v. Cook County, Illinois,* — U.S. —, —, 113 S.Ct. 538, 546, 121 L.Ed.2d 450 (1992) ("the [Fourth] Amendment's protection applies in the civil context as well.") (citations omitted).

Other courts have construed the Fourth Amendment's protections to apply to involuntary hospitalizations. In *Maag v. Wessler,* 960 F.2d 773 (9th Cir.1991), the court explained: "Although confinement of the mentally ill by state action is generally analyzed under the due process clause of the fourteenth amendment, we analyze the distinct right to be free from an unreasonable government seizure of the person for whatever purpose." *Id.* at 775 (citations omitted). *See also, Gooden v. Howard County, Md.,* 954 F.2d 960 (4th Cir.1992) (en banc); *Villanova v. Abrams,* 972 F.2d 792 (7th Cir.1992); *Harris v. Pirch,* 677 F.2d 681 (8th Cir.1982); *In re Barnard,* 455 F.2d 1370, 1373 (D.C.Cir.1971). We agree with these decisions and conclude that the Fourth Amendment applies to involuntary commitment.

 Nevertheless, because the "seizure" of Glass was reasonable, the defendants are entitled to qualified immunity. The standard for qualified immunity in the Fourth Amendment context is objective reasonableness. *See Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1988). The Fourth Amendment requires that an involuntary hospitalization "may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Villanova,* 972 F.2d at 795.

Because we have already concluded that the defendants were objectively reasonable in finding Glass dangerous in the due process context, it follows that they were objectively reasonable in making the same determination in the Fourth Amendment context. Therefore, the defendants are protected from liability for violating the Fourth Amendment by the doctrine of qualified immunity.

Affirmed.