### Eyal KATZMAN, Plaintiff,

v.

**Dr. KHAN, Individually, and in his capacity as an employer/agent of the Queens Hospital Center; Dr. Martin, Individually, and in his capacity as an employer/agent of the Queens Hospital Center; Dr. Locuratolo, Individually, and in his capacity as an employer/agent of the Creedmoor Psychiatric Center; Dr. Sanker, Individually, and in his capacity as an employer/agent of the Creedmoor Psychiatric Center, Defendants.**

**No. 97 CV 3210(NG).**

United States District Court, E.D. New York.

Sept. 17, 1999.

Eyal Katzman, for plaintiff, pro se.

Jay Weinstein, Office of the Attorney General of N.Y. State; Alessandra E. Zergniotti, Corporation of the City of New York, New York City, for defendant.

## MEMORANDUM AND ORDER

GERSHON, District Judge.

Pro se plaintiff Eyal Katzman brings this action under 42 U.S.C. § 1983 against defendants Dr. Khan, Dr. Martin, Dr. Locuratolo and Dr. Sankar alleging violations of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. Plaintiff further seeks relief under New York common law for false imprisonment, medical malpractice, emotional distress, fraud and breach of contract, and under the New York State Mental Hygiene Law ("MHL"). In short, plaintiff contends that his emergency room detention at the Queens Hospital Center ("QHC") and subsequent transfer and admission to the Creedmoor Psychiatric Center ("CPC") violated the MHL and his constitutional rights. Plaintiff moves for leave to amend his amended complaint to seek additionally a declaratory judgment that the MHL is unconstitutional and to add Dr. Rubell, the attending physician at QHC, as a New York City defendant.

Both the New York City defendants (Drs. Kahn and Martin) and the New York State defendants (Drs. Locuratolo and Sankar) move for summary judgment on all of plaintiff's claims.

### Facts

Unless otherwise indicated, the following facts are not in dispute.

Pro se plaintiff Eyal Katzman, then 36 years old, began dating Sharon Meltz in September 1994. On December 12, 1994, after the relationship had ended, plaintiff

appeared outside of Meltz's apartment window in an agitated state, perspiring and calling out her name and asking her to come down to speak with him. Meltz came down and told plaintiff that she would meet him at his residence after she went back upstairs to put on a coat. Meltz then called plaintiff at his residence and told him that she intended to call his parents and tell them about his behavior. Plaintiff responded by telling Meltz, "If you call my parents, I'll kill you."

After the phone conversation had ended, Meltz walked by plaintiff's residence and saw him in front of the building lying on a stretcher, with both hands and feet cuffed. According to both plaintiff and the emergency room screening/admission note, the police had been summoned to the vicinity for an unrelated reason, but noticed plaintiff acting in a bizarre and threatening manner which prompted them to physically restrain plaintiff. According to the admission note, which warned under the "special precautions" heading that plaintiff was under observation for "agitated behavior," plaintiff had been observed by both Emergency Medical Services ("EMS") and police officers "running through the building, was wild, screaming, very agitated, fighting with them" and "needed to be handcuffed." State Defs.Ex. D. The admission note further stated that plaintiff asked police if he was going to be shot and told them alternately that they should shoot him and that the world was beautiful and he did not want to die. Plaintiff also sustained bruises and a black eye during his exchange with the police. When plaintiff caught sight of Meltz as he lay in the stretcher, he began screaming her name at the top of his voice.

At approximately 9:40 p.m., plaintiff was transported to the emergency room at QHC, arriving at 9:47 p.m. At approximately 10:00 p.m., Dr. Rubell, the attending emergency room psychiatrist at QHC, conferred with the police officers and the

EMS personnel who had brought in plaintiff and who repeated to him what they had observed, as described above. In addition, Dr. Rubell spoke by telephone with Ms. Meltz and a Dr. Ann Gracer, a psychologist and Meltz's roommate at the time. They informed Dr. Rubell that Meltz had ended her relationship with plaintiff and he had appeared at her apartment, screaming and cursing. Meltz also stated that he had been harassing her by telephone asking him if she loved him, raving that everyone was against him, and telling her that the FBI and the government were involved in a conspiracy. Plaintiff's father, who had been notified that plaintiff was being brought to the QHC, arrived at the QHC and told Dr. Rubell only that he knew his son had been working on a paper about the FBI and had called them for research purposes. After he examined the plaintiff, Dr. Rubell stated in his notes that plaintiff had "given a different account about what happened" and was "guarded about giving out information about girlfriend." City Defs.Ex. E. Dr. Rubell noted that he was loud with pressured speech, diagnosed him as "bipolar disorder manic," and planned to admit him to the CPC because he believed plaintiff was a "danger to himself and others." *Id.*

At 10:35 p.m., Dr. Kahn, a resident psychiatrist in the emergency room, also spoke with plaintiff at the QHC. He noted on plaintiff's chart that plaintiff had told him that he had fought with his girlfriend and that there could be stress in his life which made him more irrational towards the police. With regard to plaintiff's suspicions of the FBI, Dr. Kahn indicated in his notes that he had confirmed with plaintiff's father that plaintiff believed the FBI was "against him," but the doctor was unable to elicit from plaintiff anything beyond the fact that he had been doing academic research on the FBI and was dealing with the FBI in the Eastern District.[1]

---

1. At that time, plaintiff had pending the action *Katzman v. Sessions, FBI*, 92 CV 6055, in

the Eastern District of New York. The case has since been dismissed without prejudice by

Dr. Kahn therefore noted that he could not ascertain whether plaintiff's statements about the FBI were real or delusional. The doctor concluded that plaintiff had suffered a brief psychotic disorder and diagnosed a delusional disorder and an adjustment disorder.

Throughout the night at the QHC, nurses checked in on plaintiff and consistently noted that he was restless and demanding to be discharged. Dr. Kahn called the CPC at 4:30 a.m. about transferring plaintiff to that facility. Dr. Rubell checked in on plaintiff at 6:56 a.m. and wrote on his chart that plaintiff had been irritable and intrusive all night, symptoms he believed to be consistent with a bipolar disorder. A neurology consultation, upon the request of a Dr. Dintins from the CPC, was completed by a Dr. Gonzalez but revealed no findings of neurological abnormalities. At 1:00 p.m., Dr. Martin, the Physician–in–Charge, examined plaintiff and noted that he continued to complain about his transfer and admittance to CPC, but admitted that he had fought with police and threatened to kill his girlfriend. Dr. Martin observed that his speech was rapid and pressured with clear suspiciousness and paranoia, and further noted that plaintiff believed Dr. Kahn hated him and conspired to "do him ill." Dr. Martin concurred with Dr. Rubell's recommendation that plaintiff required admission to the CPC pursuant to Mental Hygiene Law § 9.39 as he remained a danger to others.

Plaintiff was transferred from the QHC to the CPC by ambulance at 1:30 p.m. on December 13, 1994. At the CPC, Dr. Locuratolo examined plaintiff and diagnosed him with bipolar disorder and manic with psychotic features. During the examination, plaintiff admitted to Dr. Locuratolo that he had a "scuffle with the police officer," and that he had gotten "very excited." Plaintiff also speculated that when he had told Meltz "something about himself,"

she had "gotten scared" and possibly called the police. Dr. Locuratolo told plaintiff that he was keeping plaintiff at the hospital for observation, to which plaintiff responded by stating that he wanted a lawyer present. Plaintiff also became very agitated, combative and uncooperative. Dr. Locuratolo indicated in his notes that plaintiff called his parents at that point and was very angry with them. Dr. Locuratolo concluded in his notes that plaintiff needed "further psychiatric treatment and observation in the hospital because he appeared delusional and agitated," his insight and judgment were poor, and because of his reported threatening behavior towards others. State Defs.Ex. D. Plaintiff was then admitted on emergency status to ward 127 and placed on one-on-one observation. He was also given a Notice of Status and Rights regarding his emergency admission.

The next day, December 14, 1994, Dr. Sankar interviewed plaintiff and confirmed Dr. Locuratolo's finding that plaintiff had a mental illness which required his involuntary hospitalization. Dr. Sankar diagnosed plaintiff as suffering Adjustment Disorder with a Mixed Disturbance of Mood and Conduct. She concluded that one-on-one observation was no longer necessary but that plaintiff should receive counseling and therapy upon release to help him deal with stress.

Dr. Sankar interviewed plaintiff again on December 16, 1994. Dr. Sankar noted in her progress notes that plaintiff admitted that he had threatened his girlfriend by saying, "I'm going to kill you," but claimed that he meant it only as a figure of speech. Dr. Sankar described plaintiff as being friendly, cooperative and calm, and that he did not exhibit any signs of depression or psychotic features. She approved him for discharge. Her discharge summary stated that she spoke with Meltz, who reported no prior assaultive or abu-

this court by order dated March 12, 1999. Plaintiff initiated another action, *Katzman v. C.I.A.*, 94 CV 5239, which was dismissed on

October 15, 1996 by the Honorable Joanna Seybert upon the defendant's motion for summary judgment.

sive behavior by plaintiff, but that he had been "hyper" for a few days. Dr. Sankar advised her to seek an order of protection if she felt concerned about plaintiff's violence; Meltz declined. Plaintiff was discharged to his father on December 16, and a follow-up appointment was scheduled for December 19, 1994.

Plaintiff disputes the above facts only to the following extent: he claims that, although he did tell Meltz, "If you call my parents, I'll kill you," he characterizes this merely as "rhetorical hyperbole." He describes Meltz as a "liar, a perjurer, and an abuser of process," and describes her arrival at his apartment on the night he was committed as an indication that "she did not perceive [his] words as a threat." Plaintiff denies that he was violent or that he tried to escape from the police in front of his apartment building and asserts that the police and Meltz were "interested, unreliable third parties with malicious motives." He states that the police punched him in the face and cuffed him "without probable cause" and before Meltz had arrived to tell the police about his threatening behavior. Therefore, he alleges, the police used her account to justify restraining plaintiff only after the fact. Plaintiff further disputes the EMS report describing his irrational behavior as it was, he argues, dictated directly by the police rather than observed firsthand by the EMS. Plaintiff states that he only shouted Meltz's name several times outside of her building because he believed her doorbell was not working or that she could not hear it; he insists that he did not curse, scream or threaten to kill Meltz at that time. Finally, plaintiff contends that he was never examined by and never spoke to Dr. Sankar and that he was never "interviewed" by any of the doctors until the interview on December 16, 1994 leading to his release (which, according to the release forms, was conducted and documented by Dr. Sankar).

*Procedural History*

Plaintiff commenced an action against Sharon Meltz in state court, alleging misrepresentation, defamation, malicious prosecution, and intentional infliction of emotional distress. The New York State Supreme Court, Kings County, dismissed the action by order and judgment dated April 4, 1996 on the ground that the claims lacked merit. Leave to appeal was denied on March 31, 1998.

Almost one year after his admission to the CPC, plaintiff sought to file a late Notice of Claim against the State of New York. The Court of Claims denied this application for undue delay in filing and for failure to demonstrate a meritorious claim. The denial was affirmed by the Appellate Division, Second Department, on January 27, 1997, and leave to appeal was denied on May 6, 1997.

On March 20, 1996, plaintiff filed a notice of claim against the City of New York, the New York City Police Department and the New York City Health and Hospitals Corporation. Plaintiff's claims included assault, battery, false arrest, and false imprisonment. By letter dated April 22, 1996, the City of New York Office of the Comptroller disallowed plaintiff's notice of claim for failure to comply with General Municipal Law § 50-e.

Plaintiff commenced this action on June 2, 1997 against defendants Drs. Martin, Kahn, Locuratolo and Sankar. Plaintiff filed an amended complaint on August 1, 1997. Plaintiff now seeks a further amendment to add Dr. Rubell as a City defendant and to seek a declaratory judgment that MHL § 9.39 is unconstitutional.

**Discussion**

**Summary Judgment Standards**

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must

demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In addition, the court is mindful that it must construe liberally the claims of a pro se litigant, such as plaintiff here.[2] *See, e.g., Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**Section 1983 Claim**

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) he was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was committed by a person acting under the color of state law. *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). As a preliminary matter, defendants do not dispute that both the state and the city defendants qualify as individuals "acting under the color of state law." Government officials who are sued in their individual capacity under Section 1983 are qualifiedly immune from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Rather than a generalized standard of reasonableness, the Supreme Court has held that "the right the official is alleged to have violated must have been 'clearly established' in a

more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," and "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The *Anderson* Court further emphasized that the crucial determination to make is not the lawfulness of an official's actions, but whether it is "objectively legally reasonable" for an official to believe he or she acted in accordance with existing law. *Id.* at 644, 107 S.Ct. 3034. Therefore, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

An involuntary civil commitment is a "massive curtailment of liberty," *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), requiring due process protection, *see Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). "As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to [himself] or to others [and][a]s a procedural matter, due process does not permit continuation of a challenged involuntary civil commitment without a hearing, at which the substantive predicates must be established by clear and convincing evidence." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995). However, *Rodriguez* recognized that the clear-and-convincing standard of proof does not apply to a decision whether or not to order an emergency commitment. *See id.* at 1062. Rather, in order to satisfy due process for an emergency admission, a physician's determination of a patient's "dangerousness" must "be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally

2. Pro se plaintiff states that he has graduated from law school and, at the time of submission of his papers, was awaiting admission to the New York State Bar.

accepted in the medical community." *Id.* Where the undisputed facts show that it was objectively reasonable for a physician to commit an individual involuntarily on an emergency basis, summary judgment may be granted in favor of the defendants. *See, e.g., Kulak v. City of New York,* 88 F.3d 63, 76 (2d Cir.1996); *Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir.1993); *Sumay v. City of New York Health and Hosp. Corp.,* 1998 WL 205345, at *6 (S.D.N.Y.1998); *Richardson v. Nassau County Med. Ctr.,* 840 F.Supp. 219, 222 (E.D.N.Y.1994). Where there are questions of fact in conflict, however, regarding the standards of the medical profession and whether a physician's performance falls substantially below these standards, courts have denied summary judgment. *See Rodriguez,* 72 F.3d at 1063, 1065; *Thompson v. Beth Israel Med. Ctr.,* 1999 WL 228387, at *2 (S.D.N.Y.1999); *Lubera v. Jewish Ass'n for Services for the Aged,* 1996 WL 426375, at *7 (S.D.N.Y.1996).

In New York, involuntary emergency commitments are governed by MHL § 9.39 which states that:

> [t]he director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients ... may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.

The statute defines "likelihood to result in serious harm" as:

> (1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
> (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

The Second Circuit held in *Rodriguez* that Section 9.39 implicitly requires physicians to make such determinations "in accordance with the standards of the medical profession." *Id.* at 1063. "Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment—affecting whether an individual is to be summarily deprived of her liberty—be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community." *Id.*

The undisputed facts show that both the state and city defendant doctors acted in an objectively reasonable manner in finding plaintiff to be a danger to others and deciding to commit him involuntarily to the CPC; therefore, they are qualifiedly immune from liability under Section 1983. Plaintiff does not dispute that he told Meltz, "If you tell my parents, I'll kill you." He claims that it was uttered as mere "rhetorical hyperbole" and that Meltz could not have felt threatened if she proceeded to walk in the direction of his apartment. However, the police had independently assessed plaintiff as behaving bizarrely and aggressively even before Meltz arrived at the scene and described his threatening behavior towards her. The doctors at the QHC rightly considered both the EMS report and Meltz's statements before also making their own findings and determinations. Three different doctors at the QHC examined plaintiff and diagnosed him as delusional and requiring committal to the CPC. Dr. Martin, the final doctor to examine plaintiff at the QHC, noted that plaintiff believed Dr. Kahn to be "against him." At the CPC, two different doctors examined plaintiff, one finding him initially to require one on one observation, and both confirming mental illness requiring involuntary hospitalization.

■ Plaintiff contends that defendants' performance fell below general standards of medical care by arguing that none of the doctors truly interviewed him until he was examined immediately before his release from the CPC, that the doctors assessed his condition based solely on the EMS report and Meltz's descriptions, and that the QHC violated MHL § 9.39 by failing to give him a Notice of Status and Rights. None of these allegations raise a material issue of fact sufficient to defeat summary judgment. First of all, MHL § 9.39 only requires a Notice of Status and Rights once a patient has been admitted as a patient. The City defendants (QHC) contend that plaintiff was never admitted as an in-patient at any time; he was merely admitted to the psychiatric emergency room and held there for 16 hours until the CPC was able to receive and admit him as an in-patient. Once plaintiff was admitted as a patient at the CPC, he was provided with a Notice of Status and Rights, dated December 13, 1994, the day of his admission to the CPC, and a copy of which plaintiff attached to his amended complaint.

■ As for his contentions that none of the defendants truly examined plaintiff and that the doctors relied solely on "unreliable third parties," plaintiff submits nothing beyond these conclusory allegations to support his position. In *Rodriguez* and *Lubera*, where summary judgment was denied, the plaintiffs had submitted affidavits from expert witnesses indicating in detail and from a medical perspective why the defendants' decision to commit the plaintiffs were objectively unreasonable. *See Rodriguez*, 72 F.3d at 1064–65; *Lubera*, 1996 WL 426375, at *7. Here, however, pro se plaintiff's albeit exhaustive discussion of the medical records is based on nothing more than blanket denials of his bizarre behavior and bald assertions that his examining doctors fabricated their observations. As stated in *Kulak v. City of New York*, which granted summary judgment in favor of defendants, "[n]othing in *Rodri-*

*guez* purports to hold that bare denials of statements allegedly made by patients under such circumstances is enough to defeat summary judgment." *Kulak*, 88 F.3d at 76. Summary judgment must be granted in favor of defendants on plaintiff's Fourth and Fifth Amendment claims.

■ Plaintiff also alleges violations of the Fifth, Sixth and Eighth Amendments. Plaintiff's Fifth Amendment claim is that his right to counsel was violated, and he cites *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Application of Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). He quotes *Application of Gault* which states that the "privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory." *Id.* at 47, 87 S.Ct. 1428. Plaintiff's arguments appear, however, to conflate *Miranda*'s right to counsel during custodial interrogations in a criminal setting, and the privilege against self-incrimination offered under the Fifth Amendment as addressed by *Application of Gault*. According to the undisputed facts, plaintiff was not subjected to a custodial interrogation in a criminal setting, nor was he questioned with the intent to extract information to be used against him in a criminal proceeding.

■ Similarly, both the Sixth and Eighth Amendments are inapplicable to the factual allegations asserted by plaintiff. The Sixth Amendment expressly protects only those accused in a "criminal prosecution." *See* U.S. Const. amend. VI. The Eighth Amendment protects those convicted of crimes against "cruel and unusual punishment," and applies only after conviction. *See Whitley v. Albers*, 475 U.S. 312, 318–19, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Plaintiff now clarifies that his Eighth Amendment claim is against Dr. Locuratolo only for "forceful administration of psychotropic drugs." Despite plaintiff's attempts to characterize his involuntary commitment and mental examinations as accusatory and therefore some-

how criminal in nature, none of the facts in this case give rise to a claim under the Sixth or Eighth Amendments. Plaintiff's claims alleging violations of the Fifth, Sixth and Eighth Amendments must be dismissed.

**State Law Claims**

As all of plaintiff's federal claims have been dismissed, the court declines to exercise supplemental jurisdiction over the remaining state law claims, *see* 28 U.S.C. § 1367(c)(3), and the claims are dismissed without prejudice.

**Constitutionality of New York's Mental Hygiene Law**

 Plaintiff seeks leave to amend his complaint to add a claim seeking a declaratory judgment that MHL § 9.39 is unconstitutional. As acknowledged by both plaintiff and defendants, the Court of Appeals for the Second Circuit has considered at length the constitutionality of Section 9.39 and determined that it passes constitutional muster. *See Project Release v. Prevost*, 722 F.2d 960, 974–75 (2d Cir. 1983). The court stated:

> In our view, given the "layers of professional and judicial review" contained in the New York State Mental Hygiene Law's elaborate notice and hearing provisions, including notice to relatives and others designated by the patient, and the availability of a judicial hearing within five days of demand by the patient, relative or friend, as well as habeas corpus relief, we find that the statute meets procedural due process minima.

*Id.* at 975. Plaintiff states that he wishes to challenge specifically the first part of Section 9.39's statutory scheme which allows detention for up to five days without a hearing. He argues that *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), requiring probable cause determinations no later than 48 hours after a criminal arrest is equally applicable here in the civil context. The crucial determination, he argues, is not whether the detention is in the crimi-

nal or civil context, but whether there is a "significant restraint on liberty."

Despite plaintiff's contentions otherwise, the Second Circuit's holding in *Project Release* is applicable to his proposed claim. In *Project Release*, the Second Circuit specifically considered and rejected the argument that probable cause hearings should be required within 48 hours under MHL § 9.39. The court further stated that the appellants' arguments "appear to rely upon the premise that civil commitment is tantamount to incarceration for criminal conduct." *Id.* at 974. The court concluded that

> [w]e acknowledge the deprivation of liberty involved in involuntary civil commitment, but *we are not prepared to invoke the same procedural standards required in the criminal context* .... In the context of the New York State statute as a whole, given the availability of hearings, counsel and periodic status review, in our view, the time periods embodied in the M.H.L. fall within the bounds of procedural due process.

*Id.* at 974–75 (emphasis added). Therefore, plaintiff cannot raise a constitutional challenge to MHL § 9.39 which has not already been considered and rejected by the Second Circuit, and his motion for leave to amend his complaint is denied.

**Dr. Rubell**

Plaintiff seeks leave to amend his complaint by adding Dr. Rubell as a city defendant. For the reasons stated above granting summary judgment in favor of both the city and state defendants, Dr. Rubell is qualifiedly immune from liability under Section 1983 and plaintiff's request to amend his complaint is denied.

**Conclusion**

Plaintiff's federal claims are dismissed in their entirety. The court declines to exercise supplemental jurisdiction over plaintiff's state law claims and these claims are dismissed without prejudice. Plaintiff's

request for leave to amend his complaint is denied.

The Clerk of Court is directed to close this case.

**SO ORDERED.**