**Terri HOYER, Plaintiff**

**v.**

**Officer M. DiCOCCO, Defendant.**

**Civil Action No. 3:04CV1526(CFD).**

United States District Court,
D. Connecticut.

Sept. 22, 2006.

John R. Williams, New Haven, CT, for Plaintiff.

Beatrice S. Jordan, Thomas R. Gerarde, Howd & Ludorf, Hartford, CT, for Defendant.

### RULING ON MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

Plaintiff Terri Hoyer brought this action under 42 U.S.C. § 1983 against Wallingford Police Officer Mark DiCocco in his individual capacity. Hoyer claims that DiCocco falsely arrested and imprisoned her without lawful justification, in violation of her rights under the Fourth Amendment to the United States Constitution. Hoyer also claims that DiCocco was negligent in his decision to seize her. DiCocco has moved for summary judgment. For the following reasons, that motion is granted in part and denied in part.

### I. Background [1]

Hoyer suffers from a delusional disorder that manifests itself through auditory hallucinations. On the evening of March 31, 2004, Hoyer contacted the Wallingford Police Department to make a complaint regarding verbal harassment. Wallingford Police Officers Mark DiCocco and Michael Forcier (the "Officers") were dispatched in response to Hoyer's complaint. Upon the Officers' arrival, Hoyer reported that she heard voices stating, "Terri you whore, you slut," and "Terri get out of here, go away." Upon inquiry by DiCocco, Hoyer could not identify where the voices originated from. According to the police report, a Police Emergency Examination Request prepared by DiCocco and affidavits filed by DiCocco and Forcier, Hoyer appeared to be agitated, irritated, and having mood swings. The Officers also reported that "[Hoyer] went from lucid to highly agitated without reason." According to the Officers, they observed that Hoyer had altered breathing and was clenching her fists and

---

**1.** The facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

pacing. Hoyer admits that she was "a tad angry" about the voices, but does not recall whether her breathing was altered or whether she was pacing, or clenching her fists. In her deposition testimony, Hoyer admitted that she expressed surprise that the Officers were not able to hear the voices: "I do recall saying about them not hearing the defamation ... the police department seems to be the only ones not hearing the defamation. That was a crack against them I believe."

Based on Hoyer's statements and behavior, DiCocco concluded that Hoyer was mentally ill and could possibly be a danger to herself or others whom she believed were the cause of the voices. DiCocco also "was aware of the fact that Terri Hoyer owned a firearm" and "was aware of the fact that Terri Hoyer had a valid pistol permit."[2] DiCocco advised Hoyer. that he believed she posed a danger to herself and asked her if she would go to the hospital voluntarily for a psychiatric evaluation. DiCocco further advised Hoyer that she could go voluntarily or he could effect an involuntary psychiatric evaluation pursuant to Connecticut General Statutes § 17a–503. According to the Officers, Hoyer voluntarily left her apartment, and was transported by ambulance to MidState Medical Center. According to Hoyer's deposition testimony, DiCocco showed her a form that she believed authorized him to take her to the hospital and she repeatedly refused her consent. She claims that while she was not physically compelled to leave her apartment, she only left because she believed that she had no choice. According to Hoyer's interrogatory responses she believed that "if [she] did not go, [she] would have been committed for three days as stated on the bottom of the form" that DiCocco showed her. Further, according to Hoyer's deposition testimony she "felt backed into a corner.... [W]hen Officer DiCocco asked if [she] would voluntarily or involuntarily go ... [she] felt [she] had no choice ... [because] ... [DiCocco] pointed to the bottom of that form ... [a]nd at the bottom I believe he showed me the authorization that allowed this." Hoyer also claims that after DiCocco asked her whether she would go voluntarily she called her lawyer and left a message asking whether the form was valid and DiCocco had authority to commit her.

DiCocco traveled separately to MidState Medical Center. He completed a Police Emergency Examination Request and delivered it to the hospital. Upon Hoyer's arrival at the medical center, she was evaluated by hospital personnel, including psychiatrist Theresa Porter. Hoyer's Clinical Emergency Intake indicates that Hoyer had "repeated [diagnoses] of Schizophrenia" and that in the past her auditory hallucinations had caused her sleep deprivation by instructing her not to sleep. While Dr. Porter noted that Hoyer had a "long [history of] static paranoid delusion," Dr. Porter found that Hoyer's judgment

2. Under Connecticut law, in order to obtain a permit to carry a handgun the chief of police for the applicant's town must find that the applicant "intends to make no use of any pistol or revolver ... other than a lawful use and that such person is a suitable person to receive such a permit." Connecticut General Statutes § 29–28(b). Further, the applicant cannot have "been confined in a hospital for persons with psychiatric disabilities ... within the preceding twelve months by order of a probate court." Id.

According to Hoyer, her permit was issued by the Town of Glastonbury on November 9, 1984 and from the Connecticut State Police Department on November 10, 1984. Her firearm was a Smith & Wesson model 642, .38 Special revolver. According to Hoyer, she purchased the firearm in 1993 when she was working as a "first line servicer" for Wells Fargo Armored Security. It appears that DiCocco only knew that Hoyer had a permit and a firearm on the night of March 31st.

and impulse control appeared adequate for her safety. After discussing the situation with two other doctors, Dr. Porter found that Hoyer did not meet the criteria for a Physician's Emergency Committal.[3] Because Hoyer refused treatment, she was released.

Hoyer claims she is well known to the Wallingford Police Department and Mid-State Medical Center as a person who suffers from mental illness, but is not dangerous as a result of that illness. DiCocco appears to have been aware of Hoyer's history at the time of the incident. In his affidavit in support of the motion for summary judgment, DiCocco reported that Hoyer had called the police about her auditory hallucinations approximately eighty times in a three year period between January 2003 and November 2005. Hoyer's Clinical Emergency Intake indicates that the police reported that Hoyer "constantly makes contact w/ the PD and does not have any reality based complaints."

## II. *Summary Judgment Standard*

■ In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)

(quoting Fed.R.Civ.P. 5(c)); *accord Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

■ Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. *Celotex*, 477 U.S. at 323–25, 106 S.Ct. 2548; *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir.1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). A plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993). Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R.Civ.P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. When addressing a motion for summary judgment, the Court resolves "all ambiguities and

---

3. Conn. Gen. Stats. § 17a–502 provides for emergency committal by a physician: "Any person who a physician concludes has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities, may be confined in such a hospital, either public or private, under an emergency certificate as hereinafter provided for not more than fifteen days without order of any court."

draw[s] all inferences in favor of the non-moving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Maffucci*, 923 F.2d at 982.

### III. *Discussion*

The defendant moves for summary judgment on both claims in the complaint. Specifically, he argues that (1) Hoyer's claim of false arrest and imprisonment fails as a matter of law because she was neither arrested nor illegally seized; (2) Hoyer's claim of false arrest and imprisonment is barred by qualified immunity; and (3) Hoyer's claim of negligence is barred by governmental immunity. Hoyer does not object to DiCocco's motion for summary judgment on Count Two, the negligence count, and thus it is granted as to that claim.[4] Hoyer does object to that part of the motion for summary judgment concerning Count One, the false arrest and imprisonment count.

Hoyer asserts that there are genuine issues of material fact about whether she was in custody and whether DiCocco had a sufficient legal basis for taking Hoyer into custody. The Court finds that there are genuine issues of material fact as to whether Hoyer was in custody. Further, the Court finds that the undisputed facts and the disputed facts construed in the light most favorable to Hoyer are insufficient to demonstrate that DiCocco is entitled to qualified immunity at this juncture.

Thus, the motion for summary judgment on Count One is denied, as discussed below.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). The policy underpinnings of this doctrine involve "strik[ing] a balance 'between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.'" *Locurto v. Safir*, 264 F.3d 154, 162–63 (2d Cir.2001) (quoting *Kaminsky v. Rosenblum*, 929 F.2d 922, 924–25 (2d Cir.1991)). Simply stated, qualified immunity ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

As the Second Circuit has summarized:

A threshold question for triggering the qualified immunity doctrine is whether an official's conduct violated a constitutional right.... If so, we then must decide whether qualified immunity attaches. Qualified immunity is warranted if either (1) the official's actions did

---

4. Federal Rule of Civil Procedure 56 provides that if a non-moving party fails to oppose a summary judgment motion, then "summary judgment, *if appropriate,* shall be entered against" him. Fed.R.Civ.P. 56(e)(emphasis added). The Second Circuit has made clear that if the moving party's evidence does not satisfy the burden of production, "then summary judgment must be denied even if no opposition evidentiary matter is presented." *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004) (internal quotations, citation & emphasis omitted). Because DiCocco has satisfied his burden of production, summary judgment is granted for the defendant as to Count Two.

not violate clearly established law, or (2) even if the actions violated a clearly established law, the official was objectively reasonable in believing in the lawfulness of his actions.... The presumption in favor of finding qualified immunity is necessarily high, protecting all but the plainly incompetent or those who knowingly violate the law.

*Connecticut v. Crotty*, 346 F.3d 84, 101–02 (2d Cir.2003) (citations and quotations omitted). *See also Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995); *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir.1999).

### 1. Alleged Constitutional Violation

■ The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. An involuntary hospitalization can amount to a seizure under the Fourth Amendment. *See, e.g., Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir.1993). However, DiCocco claims that there was no Constitutional violation because Hoyer was never "seized." DiCocco argues that Hoyer's hospitalization was voluntary because she was never restrained and never physically forced to leave her apartment or to board the ambulance.

■ While physical force is highly relevant to determining whether a seizure has occurred, it is not essential. "Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also, U.S. v. Drayton*, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("If a reasonable person would feel free to termi-

nate the encounter, then he or she has not been seized.").

In *Perrelli v. Taylor*, the United States District Court in Connecticut granted summary judgment in a similar situation as it found that there was no evidence that the plaintiff was forced to go to the hospital against his will where he did not physically resist the ambulance, was not handcuffed, and the defendant police officer traveled to the hospital in a separate vehicle. 2003 WL 23648096 (D.Conn. Sept. 5, 2003) While Hoyer was not physically restrained and did not physically resist, she maintains that she was nonetheless involuntarily hospitalized because she clearly and repeatedly refused her consent. According to Hoyer, she felt she had "no choice" about leaving her apartment because of the form that DiCocco showed her. The Court finds that a reasonable juror could find that DiCocco used a "show of authority" to seize Hoyer, and thus that her hospitalization was involuntary. As discussed below in Part II.C, the Court also finds that, based on the undisputed facts and the disputed facts construed in the light most favorable to Hoyer, a reasonable juror could conclude that the seizure was unreasonable, and thus a violation of the Fourth Amendment.

### 2. Was the Violation Contrary to Clearly Established Law?

"In determining whether a particular right was 'clearly established' for purposes of assessing a claim of qualified immunity, the Second Circuit has instructed District Courts to consider three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have under-

stood that his or her acts were unlawful." *Clarke v. Sweeney,* 312 F.Supp.2d 277, 299 (D.Conn.2004), citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991). *See also McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999) (holding that right is "clearly established" if its contours are sufficiently clear that reasonable official would understand that his conduct violated right).

The Second Circuit has recognized the right to be free from involuntary hospitalization absent probable cause: "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir. 1993), quoting *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992). The Supreme Court and the Second Circuit have also "noted that ' "a state cannot constitutionally confine without more a *nondangerous* individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members." ' " *Kerman v. City of New York,* 374 F.3d 93, 110 (2d Cir.2004) (*"Kerman II"*) (emphasis in original) (quoting *Glass v. Mayas,* 984 F.2d at 57 and *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)).

Connecticut state law and the decisions of the Second Circuit provide the "governing legal standard" and clearly establish the contours of the right. Conn. Gen.Stat. § 17a–503(a) permits involuntary hospitalization by a police officer and requires a finding both of psychiatric disability and dangerousness:

> Any police officer who has *reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself* . . . or others or gravely dis-

abled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section.

Conn. Gen.Stat. § 17a–503(a) (emphasis added).

 "Thus, the availability of qualified immunity turns on whether it was objectively reasonable for the defendants to believe, at the time they examined [the plaintiff] and in light of the information that they possessed, that [the plaintiff] was dangerous." *Glass v. Mayas,* 984 F.2d at 57. *See also, Kerman v. City of New York,* 261 F.3d 229 (2d Cir.2001) *Anthony v. City of New York,* 339 F.3d 129, 137 (2d Cir.2003) (*"Kerman I"*); *Kerman II,* 374 F.3d at 111 (finding that as of 1995 it "was sufficiently clear in light of preexisting law that Kerman had a right not to be detained or involuntarily hospitalized by an officer who . . . did not know, and who patently ignored opportunities to determine, . . . whether he was dangerous to himself or others."); *Perrelli v. Taylor,* No. 301 CV 1464, 2003 WL 23648096 (D.Conn. Sept. 5, 2003) (applying Second Circuit law and finding that qualified immunity for involuntary hospitalization based on Conn. Gen. Stats. § 17a–503(a) "hinges on whether it was objectively reasonable for the Defendant to believe at the time of Plaintiff's hospitalization that Plaintiff suffered from a psychiatric disability and was a danger to himself or society."); *Williams v. Lopes,* 64 F.Supp.2d 37, 42 (D.Conn.1999) (applying Second Circuit law). Accordingly, the Court finds that it was clearly established that an involuntary hospitalization would violate the Fourth Amendment unless there was reasonable cause to believe both that Hoyer suffered from a psychiatric disability and that she was a danger to

herself or society. In other words, it was clearly established that absent evidence suggesting dangerousness, reasonable cause to believe Hoyer suffered from a psychiatric disability was insufficient to meet the requirements of the Fourth Amendment.

### 3. Was it Objectively Reasonable to Believe the Actions were Lawful?

██ While overt threats are not necessary to form a reasonable belief that a person is dangerous, something more than mental illness alone is required. For example, in *Kerman I* the Second Circuit observed that "the police may have been entitled to hospitalize Kerman if his conduct or the condition of his apartment demonstrated a dangerous mental state." 261 F.3d at 241. However, the court found that it was inappropriate to grant qualified immunity at the summary judgment stage where the facts about Kerman's behavior and the condition of his apartment were disputed, and Kerman claimed that the police failed to reasonably investigate his mental state. *See also Glass v. Mayas*, 984 F.2d at 57 (finding that it was objectively reasonable to seize plaintiff who had history of violent behavior where there were reports that he was threatening an individual with a gun and behaving strangely); *Perrelli v. Taylor*, 2003 WL 23648096, at *4 (finding that it was objectively reasonable to seize plaintiff who left threatening voice mail messages indicating he wanted to die and admitted history of psychiatric problems).

While it is undisputed that Hoyer suffered from mental illness, the undisputed facts and disputed facts construed in the light most favorable to Hoyer are insufficient to demonstrate that it was objectively reasonable for DiCocco to believe that she was dangerous. Absent from the record is any indication that Hoyer ever threatened to harm herself or anyone else. Indeed there is no indication that Hoyer intended to seek out or confront those she believed responsible for the voices she heard. Also absent is any suggestion that Hoyer felt threatened by the voices.

"[P]olice officers are often forced to make spot judgments about a person's mental health and should be entitled to reasonable leeway in those situations." *Kerman I*, 261 F.3d at 241. However, in this case DiCocco's assessment of Hoyer's mental health and dangerousness were apparently informed by a long history of Wallingford Police contact with Hoyer. While it is unclear whether DiCocco had prior personal contact with Hoyer, he was aware of her history, her firearm and her valid gun permit. There is no indication that the night in question was any different than any of the eighty other times Hoyer made similar complaints to the police between January 2003 and November 2005. Significantly, even after this extensive history of contact with Hoyer, there is no indication that the police ever attempted to revoke Hoyer's gun permit or seize her firearm.[5] While the fact that Hoyer had access to a gun indicates that she had the means to become dangerous, the fact

---

5. Conn. Gen. Stats. § 29–32 provides for revocation of a local permit by the authority issuing the permit including revocation based on "upon the occurrence of any event which would have disqualified the holder from being issued such local permit." In turn Conn. Gen. Stats. § 29–28 requires the local police to make a finding that the applicant intends to make no use of the permit "other than a lawful use" and that the applicant "is a suitable person to receive such permit." Conn. Gen. Stats. § 29–38c provides for the seizure of any firearms of a person "posing risk of imminent personal injury to self or others." There is also no indication that DiCocco searched for Hoyer's firearm on March 31, or asked her about it.

that she was permitted to continue to hold the gun permit suggests that the police did not have cause to believe that she would use the gun inappropriately.

"Although the issues of probable cause and qualified immunity are not congruent, in that the latter requires consideration of the reasonableness of the defendant official's perception of the law, most of the factual components ... such as what actions were taken, what information the officers possessed as to [the plaintiff's] mental condition, and whether the officers' perceptions of the circumstances were reasonable in light of the information that was available to them, [are] common to both issues." *Kerman II*, 374 F.3d 93, 116 (2d Cir.2004). Construing the facts in the light most favorable to Hoyer, the Court is unable to find that there was probable cause or that it would have been objectively reasonable for DiCocco to believe that there was probable cause and denies defendant's claim of qualified immunity, at least on summary judgment.

## IV. *Conclusion*

Defendant's motion for summary judgment [**Doc. # 17**] is granted as to Count Two of the Complaint and denied as to Count One.