# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1877

JOSEPH LOPEZ,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, JENNIFER DELUCIA,
JAMES DELAFONT, DANIEL JACOBS,
and HECTOR VERGARA,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1823—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED FEBRUARY 22, 2006—DECIDED SEPTEMBER 22, 2006

Before FLAUM, *Chief Judge,* and WILLIAMS and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Joseph Lopez was arrested by Chicago police for a murder he did not commit. The murder victim was a twelve-year-old boy, an innocent bystander hit by gunfire in a drive-by shooting. Lopez was arrested without a warrant, although with probable cause—an eyewitness identified him as the shooter.

Following his arrest, the individual defendants—all detectives with the Chicago Police Department—kept Lopez shackled to the wall of a windowless, nine-by-seven-foot

interrogation room for four days and nights while they investigated the case. Lopez had nowhere to sleep but a four-foot-by-ten-inch metal bench or the dirty brick floor. The interrogation room had no toilet or sink; he had to "scream" for the detectives to let him out to use a bathroom. He was given only one bologna sandwich and one serving of juice as food and drink during the entire four days and nights he was kept in the interrogation room. The detectives questioned him from time to time and made him stand in two lineups.

After two-and-a-half days in these conditions, Lopez started to become disoriented and began hearing voices telling him to confess. He ultimately gave a statement containing a false confession that did not match the details of the crime. On the fifth day of his detention, Lopez was moved to the city lockup, charged, and finally taken to court. The following day, the police investigation led detectives to another individual who confessed to the murder. Lopez was released the next day.

Those were the facts the jury was entitled to believe based on evidence Lopez presented during a seven-day trial on his claim under 42 U.S.C. § 1983 for violation of his constitutional rights and his supplemental state law claim for intentional infliction of emotional distress. The detectives testified differently about their treatment of Lopez while he was in their custody, but there was no dispute that they detained him for five days after his warrantless arrest without taking him before a judge for a probable cause hearing. Remarkably, after hearing this evidence, the district court refused to submit the claims to the jury and instead granted the defendants' motion for judgment as a matter of law.

We reverse. Lopez was entitled to judgment as a matter of law on his claim that the detectives violated his Fourth Amendment right to a prompt judicial determination of

probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991), holds that if a *Gerstein* probable cause hearing is not held within 48 hours of a warrantless arrest, the government must demonstrate the existence of an emergency or other extraordinary circumstance to justify its failure to promptly present the person arrested to a judicial officer for a probable cause determination. Here, the defendants offered no reason for the five-day delay other than the continuation of their investigation, but delays for the purpose of gathering additional evidence are per se unreasonable under *McLaughlin. Id.*; *see also Willis v. City of Chi.*, 999 F.2d 284, 288-89 (7th Cir. 1993).

There was conflicting evidence at trial on Lopez's treatment while in the detectives' custody, raising a jury issue on his constitutional claim relating to the conditions of his warrantless detention and his state law claim for intentional infliction of emotional distress. The district judge should not have taken these claims from the jury and resolved the factual conflict himself; they are remanded for retrial.

## I.  Background

Given the procedural posture of this case, we recount the facts based on the evidence presented at trial in the light most favorable to Lopez, the party against whom the district court entered judgment as a matter of law. *See Zimmerman v. Chi. Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004) (when considering a motion for judgment as a matter of law, a court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor). The facts pertinent to Lopez's duration-of-confinement claim under *Gerstein* and *McLaughlin* are undisputed.

On July 19, 2000, a twelve-year-old boy was shot and killed in a drive-by shooting in Lopez's Chicago neighbor-

hood. Based on one eyewitness's identification, Chicago police officers arrested Lopez without a warrant at approximately 2 p.m. on July 20. Lopez stipulated at trial that the officers had probable cause to arrest him. The arresting officers took him to the Chicago Police Department's Area 5 detective headquarters where they left him in the custody of the defendant detectives: Jennifer Delucia, James Delafont, Daniel Jacobs, and Hector Vergara.

Lopez was placed in a nine-by-seven-foot interrogation room, and one of his arms was handcuffed to a metal ring fastened to the wall about three feet off the floor. When he asked if he could be unshackled from the wall, one of the detectives—Lopez does not remember who—told him "no" because he "was a murderer." The room's brick floor was dirtied with gum, cigarette butts, used matches, wrappers, and dust. Next to the wall and below the ring to which Lopez was shackled was a metal bench that was four feet long and ten inches wide. There was no sink, toilet, or running water in the room. There was a small window in the door, but it was covered over with paper so it was impossible to see through it. The room had no clock and Lopez did not have a watch or other timekeeping device with him, so he could not tell how long he was in the room or whether it was night or day. The detectives kept Lopez shackled to the wall of this room for four days and four nights.

Lopez's expert on police practices testified that a suspect should be held in such an interrogation room only for "short durations" not to exceed "eight hours." He testified that "generally you want to—you don't want to do it longer than what would normally be a business day or would normally be something somebody could tolerate for a period of time." He also said it would "[a]bsolutely not" be appropriate to hold a suspect in an interrogation room for even twenty-four hours, let alone the four days and nights Lopez endured.

The detectives let Lopez out of the interrogation room for only a few brief moments. They removed him twice to appear in police lineups, first on the evening of July 20 and then on the evening of July 21. At some point during his detention, the detectives transferred Lopez to a second interrogation room that was essentially the same as the first. To leave the interrogation room to use the bathroom, Lopez said he had to "scream[ ] from the top of [his] lungs" to get the detectives' attention in order to be let out. It is not clear how many times Lopez asked to use the bathroom. He implied on direct examination that it was multiple times: "Sometimes I'd be yelling for a while. I don't know how long. I couldn't time myself." But on cross-examination he said he thought he only asked once to use the bathroom. At any rate, because the interrogation room lacked a sink or running water, Lopez was unable to attend to his personal hygiene in any way for the four days. He realized he began to smell badly and Detective Jacobs told him he stunk.

Lopez had great difficulty sleeping during the four days and nights he was shackled to the wall of the interrogation room. He tried once to lie down on the brick floor to get some sleep, but he woke up with shooting pains down his shackled arm, which had begun to turn purplish blue, and pain in his shoulder, hip, and knees. Lopez then sat up on the bench and kept his shackled arm level with the ring on the wall in order to restore proper circulation. He gave up trying to sleep lying down and just sat on the bench and leaned back against the wall. It seemed to Lopez that whenever he fell asleep in that seated position, he would bump his head on the wall and wake up. The little sleep he got was not restful.

For his first two-and-a-half days in the interrogation room, no one brought Lopez anything to eat or drink. He testified that he was able to grab a drink of water during his trips to the bathroom. He said, "[T]he only way I could use the bathroom or drink some water [was] if the detec-

tives that were working on my case were there. If not, I had to wait." Lopez testified that he became disoriented and began to hear voices in his head at some point after he was brought back from the second police lineup, about a day and a half into his detention. He told the jury:

> I couldn't even put my ideas in place. I couldn't even think straight. And every time I would, like, say something, I would tell myself man, you know, I didn't shoot that little boy and then a voice will click in and say yeah, you did shoot him. . . . It was just some voice that was coming from the back of my head just kept telling me yeah, you did shoot him. So after awhile me fighting against that voice, it just came true. I was like you know what, I started to believe that I did shoot [him]. . . . I was sitting there for a while and after me crying so much and trying to put thoughts all together, which wasn't even going together, I was sitting looking at the wall and I would feel like the wall was like coming in closer. And as I would feel it, it looked like it was coming in closer to me.

Lopez told the jury that by this point in his detention he could no longer think rationally and that "[his] mind was nowhere near [his] head." About 60 hours into his detention, Lopez gave a statement to Detectives Jacobs and Delafont in which he falsely confessed to having shot the twelve-year-old boy.

The details of Lopez's confession did not match the forensic evidence from the crime scene, and shortly thereafter Detective Jacobs returned to the interrogation room and angrily called Lopez a liar. The detective told Lopez he did not deserve to be a father—Lopez's girlfriend was pregnant—and suggested that his girlfriend should get an abortion. Lopez retracted his confession and told Jacobs that he had not shot anyone. One of the detectives then brought Lopez a bologna sandwich and some juice; accord-

ing to Lopez, it was the only food he received during his four-day stay. The detectives testified that they fed Lopez regularly by purchasing fast food with their own money, but they produced no receipts or other record of these purchases and there are no police documents indicating Lopez was fed in this manner.

On July 24, four days into Lopez's detention, an assistant state's attorney approved murder charges against him and he was transferred to the city lockup. There, Lopez was placed in a cell with a padded bunk for sleeping, a toilet, and a sink. He also received a meal that he recalls as a hot bologna sandwich, french fries, and a soda. All indications are that Lopez was fed regularly once he moved to the lockup.

Lopez appeared before a judge for arraignment and a probable cause hearing on July 25, five days after his warrantless arrest. The police continued to investigate the killing, and leads pointed to another individual, Miguel Figueroa, as the shooter. On July 26 Figueroa confessed to the murder. The state's attorney's office dropped the charges against Lopez and he was released on July 27.

Lopez sued the City of Chicago and the four detectives pursuant to 42 U.S.C. § 1983 alleging they had subjected him to an unconstitutional detention—because of the conditions he was subjected to and the extended duration of the detention in light of the warrantless arrest—in violation of the Fourth and Fourteenth Amendments.[1] He also

---

[1] Lopez sued the City of Chicago under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging the City had a policy or practice of detaining persons arrested without a warrant beyond *McLaughlin*'s 48-hour time period for a probable cause hearing. Lopez obtained affidavits from fourteen warrantless detainees who were held in interrogation rooms by Chicago police for multiple days, in violation of *McLaughlin*, shackled, deprived

(continued...)

asserted a state law claim for intentional infliction of emotional distress. The case was tried to a jury, which heard seven days of evidence. At the close of the evidence, both sides moved for judgment as a matter of law pursuant to FED. R. CIV. P. 50. The defendants moved for judgment as a matter of law on all claims, and Lopez moved for judgment on his constitutional claim relating to the duration of his detention.

The district court denied Lopez's motion and granted judgment for the defendants on the duration-of-detention claim, concluding that extraordinary circumstances justified the five-day delay in presenting Lopez to a judicial officer for a probable cause hearing. The judge held that because the police were "actively attempting to solve a crime" involving the "heinous" shooting of "an innocent twelve-year old boy," and because Lopez had lied to police about his identity when he was arrested and gave "false alibis" and a false confession during detention, the detectives were justified in delaying his presentment for a probable cause hearing so they could continue their investigation.

Regarding Lopez's claim relating to the conditions of his detention, the parties had agreed during trial that the Fourth Amendment's "objectively unreasonable" standard applied to the detectives' conduct and submitted jury instructions reflecting that standard. The district judge disagreed. He concluded that the evidence would have to

---

[1] (...continued)
of food and sleep, and otherwise treated in the same manner as Lopez. The City then entered a *Monell* waiver consenting to entry of judgment against it in the event "the finder of fact in this case finds that any City of Chicago employee violated Plaintiff's rights under the Constitution." On the basis of this waiver, the City moved to bar evidence of the other detainees' treatment, and the district court granted the motion.

establish the detectives acted with deliberate indifference—a standard from the Eighth Amendment and due process contexts—not merely that they acted in an objectively unreasonable manner. The judge concluded that "none of the evidence introduced at trial indicates that Defendant officers" were deliberately indifferent; "at best," the judge held, "the Defendant officers were negligent." On this basis the court entered judgment for the defendants on this claim.

Similarly, the district judge thought the evidence was insufficient to support Lopez's intentional infliction of emotional distress claim because the detectives' conduct "was at best negligent conduct." The court entered judgment as a matter of law for the defendants on this claim as well. Lopez appealed.

## II. Discussion

We review de novo the district court's decision to grant judgment as a matter of law. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 692 (7th Cir. 2005). A court may enter judgment as a matter of law only if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1). When ruling on a Rule 50 motion, a court must view the evidence presented at trial in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 975 (7th Cir. 2006).

### A. Unconstitutional Conditions of Confinement

As we have noted, during trial the parties agreed that the Fourth Amendment governed Lopez's claim that the detectives subjected him to unconstitutional conditions

and treatment during his warrantless detention. The district judge thought otherwise and evaluated Lopez's unconstitutional conditions claim using the more demanding "deliberate indifference" standard applicable to convicted prisoners' claims of cruel and unusual punishment under the Eighth Amendment and similar claims of pretrial detainees under the Fourteenth Amendment. *See, e.g.*, *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (deliberate indifference requires a culpable state of mind such as ignoring a known risk of harm; it "is more than negligence and approaches intentional wrongdoing") (quotation marks and citation omitted); *Hart v. Sheahan*, 396 F.3d 887, 891 (7th Cir. 2005) (convicted prisoners' challenge to conditions of confinement governed by the Eighth Amendment, "which has been interpreted to require proof that the convicts' custodians were deliberately indifferent to a serious hazard created by those conditions"); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (Fourteenth Amendment's due process standard as applicable to claims of pretrial detainees is the same "deliberate indifference" standard of the Eighth Amendment). The district court's application of the deliberate indifference standard made things more difficult for Lopez; the Fourth Amendment requires only proof that the defendants' conduct was objectively unreasonable under the circumstances. *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005).

The district court should have analyzed the detectives' conduct under the Fourth Amendment and its "objectively unreasonable" standard. The Fourth Amendment protects against unreasonable seizures; an arrest is a seizure, and the Fourth Amendment affords persons who are arrested the further, distinct right to a judicial determination of probable cause "as a prerequisite to extended restraint of liberty following arrest." *Gerstein*, 420 U.S. at 114. The judicial determination of probable cause may be made

before the arrest (in the form of an arrest warrant) or promptly after the arrest, at a probable cause hearing (sometimes called a *Gerstein* hearing). But whether the arresting officer opts to obtain a warrant in advance or present a person arrested without a warrant for a prompt after-the-fact *Gerstein* hearing, the Fourth Amendment requires a *judicial* determination of probable cause. *See Haywood v. City of Chi.*, 378 F.3d 714, 717 (7th Cir. 2004) (even though warrantless arrest was "clearly" supported by probable cause, Fourth Amendment required a probable cause hearing before a judicial officer).

*McLaughlin* established a general rule that persons arrested without a warrant must receive a judicial determination of probable cause within 48 hours. *McLaughlin*, 500 U.S. at 56-57. (We will have more to say on the *McLaughlin* issue later.) Because Lopez was arrested without a warrant and had not yet been presented for a probable cause hearing, the Fourth Amendment should have been applied to his claim relating to the treatment and conditions he endured during his four days and nights in warrantless detention. Although his claim does not challenge the existence of probable cause, our cases hold that the *Gerstein* probable cause hearing is the event that terminates the Fourth Amendment's applicability following a warrantless arrest.

Accordingly, we have held that "the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause." *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992); *see also Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000) (after a probable cause hearing the Fourth Amendment no longer applies); *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) (Fourth Amendment applies before the probable cause hearing and

Due Process Clause applies after); *Reed v. City of Chi.*, 77 F.3d 1049, 1052 (7th Cir. 1996) (the "seizure" of an arrestee ends after the probable cause hearing). Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction.

Although the defendants agreed in the district court that the Fourth Amendment's "objectively unreasonable" standard should apply, they have changed their tune on appeal. They now agree with the district court and argue that the claim is governed by the due process analysis applicable to claims of pretrial detainees, which borrows from the Eighth Amendment's "deliberate indifference" standard, applicable to conditions-of-confinement claims by convicted prisoners. *See Cavalieri*, 321 F.3d at 620. They cite *Wilkins v. May*, 872 F.2d 190, 193-95 (7th Cir. 1989), but their reliance on that case is misplaced. Although *Wilkins* held that the period between arrest and charge falls under the rubric of due process rather than the Fourth Amendment, later cases, cited above, have limited *Wilkins* in light of *Gerstein* and *McLaughlin*. In particular, *Villanova* specifically recognized the tension between this court's holding in *Wilkins* and the *Gerstein/McLaughlin* line of cases, which apply the Fourth Amendment's reasonableness standard to the deprivation of liberty suffered by a warrantless arrestee. *Villanova*, 972 F.2d at 797. *Villanova* held that the conflict in the cases "can be reconciled" by applying the Fourth Amendment to the period between a warrantless arrest and the judicial probable cause determination and the principles of due process to confinement after probable cause has been judicially determined. *Id.*

The defendants cite *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), for the proposition that the Fourth Amendment does

not apply to pretrial detainees. But *Bell* concerned "persons who have been charged with a crime but who have not yet been tried on the charge"—that is, pretrial detainees for whom a judicial determination of probable cause has already been made. *Id.* at 523. That the Fourth Amendment does not apply to postarraignment detention does not make its protections inapplicable to the period between Lopez's arrest and his probable cause hearing. *Bell* is inapposite.

Lopez's trial evidence, if credited by the jury, was more than adequate to support a finding that the detectives' conduct was objectively unreasonable under the circumstances. Indeed, this case should not have been taken from the jury even if the more burdensome standard of deliberate indifference applied. The defendants concede on appeal that the district court should have permitted the jury to consider Lopez's claim insofar as it alleged that shackling him to the wall of the interrogation room for four days and nights violated his constitutional rights. The jury should have been permitted to consider the *totality* of Lopez's evidence, not just the evidence of shackling. Lopez presented evidence that he was deprived of food, drink, and sleep during the four days and nights he spent shackled to the wall of the interrogation room, and was forced to yell for an extended period of time before being let out to use the bathroom. The defendants argue there is no evidence Lopez ever asked for food or drink or soiled himself. This is an argument for a jury, not a reviewing court.

If Lopez's version of events is believed, common sense alone would justify a conclusion that the detectives' conduct was objectively unreasonable; when the fact finder's task is to decide whether an act or omission is objectively unreasonable, reliance upon common sense is particularly appropriate. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must

govern over rigid criteria."). But the jury need not have relied on common sense alone. Lopez's police practices expert testified that it would "[a]bsolutely not" be appropriate to confine an arrested person in an interrogation room for twenty-four hours, much less for four days. On this record, the district court's refusal to submit this claim to the jury was unjustified; the court impermissibly weighed the evidence and drew inferences in favor of the defendants rather than Lopez, contrary to Rule 50's governing standards. Lopez's unconstitutional conditions of confinement claim must be retried.

## B. Intentional Infliction of Emotional Distress

For similar reasons, we also reverse the judgment entered for the defendants on Lopez's state law claim for intentional infliction of emotional distress. To prove this claim, Lopez needed to establish the following: (1) that the defendants' conduct was extreme and outrageous; (2) that they intended their conduct to inflict severe emotional distress or knew there was at least a high probability their conduct would inflict such distress; and (3) that their conduct did in fact cause him severe emotional distress. *McGrath v. Fahey*, 533 N.E. 2d 806, 809 (Ill. 1988). Extreme and outrageous conduct is that which goes "beyond all bounds of decency and [is] considered intolerable in a civilized community." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E. 2d 201, 211 (Ill. 1992)); *Campbell v. A.C. Equip. Servs. Corp.*, 610 N.E. 2d 745, 749 (Ill. App. Ct. 1993).

Here again, the defendants concede on appeal that the district court erred by refusing to let the jury consider Lopez's shackling allegations. They argue nonetheless that there is no evidence from which jurors could have inferred intent, at least on the matter of the extent to which Lopez was receiving food, drink, and bathroom

access. But if the jurors believed Lopez's evidence that he received food and drink only once over the course of four days and nights in custody, then they must also conclude the defendants lied about feeding him regularly with fast-food purchases. It is not as if the detectives tried to explain away Lopez's claim by saying they all thought someone else was giving him food. Instead, they claimed they fed him several times. Either Lopez is lying or the defendants are; their stories are incompatible.

If the jurors believed Lopez's version of events, they rationally could have inferred that the detectives intentionally deprived Lopez of food and drink and deliberately withheld bathroom access for extended periods. Lopez's evidence at trial essentially painted a picture of interrogators subjecting a captive suspect to several days of dire physical deprivation in order to coerce a confession. A jury rationally could have found this conduct extreme, outrageous, and intended to inflict severe emotional distress.

This is especially so because "[t]he more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *McGrath*, 533 N.E. 2d at 809. The detectives exercised nearly complete control over Lopez's ability to move, sleep, eat, drink, and use the bathroom for the four days and nights he spent in their custody.

Finally, if the jurors believed Lopez's testimony, they rationally could have concluded that he suffered severe emotional distress when he became disoriented and started hearing voices telling him to confess to a murder he did not commit. The district court should not have granted judgment for the defendants on Lopez's claim for intentional infliction of emotional distress. The claim must be retried, and the retrial is not limited to Lopez's shackling evidence.

### C.  Unconstitutional Duration of Confinement

The district court also granted judgment for the defendants on Lopez's claim that the detectives unconstitutionally held him in custody for more than 48 hours before taking him before a judge for a probable cause hearing. The defendants do not dispute that Lopez was held for five days following his warrantless arrest before he received his *Gerstein* hearing, well beyond the 48-hour general limit established in *McLaughlin*. The defendants argue that this delay is not actionable in damages under § 1983 because the 48-hour rule of *McLaughlin* is not a core constitutional right but a procedural safeguard designed to secure the Fourth Amendment right to a prompt judicial determination of probable cause following a warrantless arrest.

*McLaughlin* and *Gerstein*, read together, foreclose this argument. *Gerstein* clearly held that a prompt judicial determination of probable cause following a warrantless arrest is a core Fourth Amendment requirement: "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following [warrantless] arrest." *Gerstein*, 420 U.S. at 114. *McLaughlin*, in turn, reiterated that "[u]nder *Gerstein*, warrantless arrests are permitted[,] but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." *McLaughlin*, 500 U.S. at 53. Police may postpone a *Gerstein* hearing for a reasonable amount of time in order to "cope with the everyday problems of processing suspects through an overly burdened criminal justice system." *Id.* at 55. *McLaughlin* held that a "judicial determination of probable cause within 48 hours of [warrantless] arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56. A lesser delay might still be unconstitutional "if the arrested individual can prove that his or her probable cause

determination was delayed unreasonably." *Id.*; *see also Willis,* 999 F.2d at 287-89. But if the delay extends *beyond* 48 hours, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance" to justify the delay. *McLaughlin*, 500 U.S. at 57; *see also Haywood*, 378 F.3d at 717 ("Haywood was arrested lawfully [with probable cause]. But he could not, consistent with the Fourth Amendment, be continued in custody beyond 48 hours . . . unless a judicial officer determined there was probable cause to believe that he had committed a crime."); *Luck*, 168 F.3d at 324.

Lopez was thus constitutionally entitled to a prompt probable cause determination by a judicial officer. Under *McLaughlin*, "prompt" in this context usually means "within 48 hours." Because the detectives held Lopez without a judicial probable cause determination beyond the 48-hour safe harbor of *McLaughlin*, it was their burden to justify the delay by demonstrating the existence of an emergency or other extraordinary circumstance. They did not do so. The defendants wisely do not defend the rationale supplied by the district court—that Lopez's "lying" (allegedly false alibis and what we know to be a false confession) prolonged their investigation. *McLaughlin* held unequivocally that delays for purposes of gathering evidence are per se unreasonable. *McLaughlin*, 500 U.S. at 56; *see also Willis*, 999 F.2d at 288-89. Lopez was entitled to judgment as a matter of law on his duration-of-confinement claim.

On remand, Lopez may recover compensatory damages for the unlawful duration of his confinement. *See Carey v. Piphus*, 435 U.S. 247, 254-55 (1978) (compensatory damages are the norm when a plaintiff prevails on a § 1983 claim for constitutional violations and can prove actual damages). The defendants argue that Lopez is entitled to only nominal damages because he stipulated there was probable cause to arrest him. This argument is weak. Lopez presented

evidence that he suffered physical and mental injuries as a result of his extended detention in the interrogation room. The jury could rationally conclude that if Lopez had received the *Gerstein* hearing to which he was constitutionally entitled, he would at least have been moved from the interrogation room to the jail before his body and mind deteriorated into the delusional state he described at trial.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND this case to the district court for entry of judgment for Lopez on his duration-of- confinement claim and for a new trial on: (1) Lopez's unconstitutional conditions of confinement claim; (2) his intentional infliction of emotional distress claim; and (3) damages. Circuit Rule 36 shall apply on remand.

A true Copy:

      Teste:

                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*

USCA-02-C-0072—9-22-06