In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3179

KENNETH COLLINS,

*Plaintiff-Appellant*,

*v.*

NADIR AL-SHAMI and
ADVANCED CORRECTIONAL HEALTHCARE, INC.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-CV-01838-TWP-DML — **Tanya Walton Pratt**, *Judge*.

ARGUED OCTOBER 26, 2016 — DECIDED MARCH 20, 2017

Before FLAUM, EASTERBROOK, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. Following an arrest for driving while intoxicated, Kenneth Collins was booked into the Jackson County Jail in Indiana. Collins later sued a jail physician and the physician's employer (a private corporation) under

42 U.S.C. § 1983 and Indiana state law, claiming that the doctor had provided inadequate medical care to Collins during his detention. The district court awarded summary judgment to defendants, and we affirm.

## I. Background

On August 12, 2012, Kenneth Collins was arrested for operating a vehicle while intoxicated. Collins was a regular drinker, and he drank heavily—often consuming around thirty beers every two days. Because he had in the past suffered from symptoms of alcohol withdrawal, Collins usually kept with him a bottle of Librium, a benzodiazepine commonly prescribed to treat withdrawal and anxiety disorders. *See* http://www.drugs.com/cdi/librium.html (last visited March 20, 2017). Collins had the bottle of Librium with him when he was arrested in August 2012, and a booking officer at the Jackson County Jail telephoned the assigned jail physician, Dr. Nadir Al-Shami, to ask about the medication. Dr. Al-Shami approved Collins's use of the Librium while in custody, and directed that he take the medication in accordance with the dosages listed on the prescription bottle. Collins was taken to a jail cell around 7:00 PM, and from 9:00 PM to around 11:30 PM, an officer checked on him approximately every fifteen minutes.

Officers continued to check on Collins into the next morning, observing that he was responsive and had no complaints. At approximately 8:30 AM on August 13, however, Collins began to complain of shaking from alcohol withdrawal, and he was given some of the Librium, as well as some thiamine (vitamin B1) and a multivitamin. By lunchtime, Collins was feeling better and eating normally; but in the afternoon, he began to complain again of having withdrawal symptoms, including

shaking, nausea, and vomiting. A nurse measured his heart and respiratory rates, temperature, oxygen levels, and blood pressure, and called Dr. Al-Shami to report her findings. The doctor ordered that Collins be given the normal treatment for alcohol withdrawal: Librium, thiamine, and multivitamins. Dr. Al-Shami also ordered that Collins be monitored for signs of withdrawal, such as shaking, sweating, and changes in mental state.

Around 7:30 the next evening (on August 14), an officer at the jail heard Collins talking to himself in his cell, and so went over to check on him. Collins was responsive and knew where he was, but seemed indifferent to his surroundings. When a nurse entered his cell around midday on August 15, Collins was delusional and showing signs of paranoia. The nurse called Dr. Al-Shami, but he was unavailable, so she telephoned another on-call physician. That physician advised the nurse to discontinue the Librium treatment and to instead administer a one-time dose of Haldol, an anti-psychotic agent. *See* http://www.drugs.com/cdi/haldol.html (last visited March 20, 2017). The nurse gave Collins the Haldol, but his symptoms did not improve; so when Dr. Al-Shami returned the nurse's earlier phone call, he told her to send Collins to the emergency room.

Collins was taken to the hospital around 1:00 PM, where medical staff measured his vital signs—all of which were normal—and performed a blood work-up. The latter showed slightly low potassium levels, and higher-than-normal levels of lactic acid and bilirubin (high bilirubin is a common symptom of alcoholism), but the examining physician, Dr. Mark Guffey, concluded that Collins was not suffering from delirium tremens (an acute form of alcohol withdrawal), because

his heart and respiratory rates were not very high, and because he was not sweating, shaking, or otherwise acting "jittery." Dr. Guffey thought the Librium pills were unnecessary, and so did not advise the jail staff to continue treating Collins with that medication upon his discharge from the hospital.

After Collins returned to the jail, officers saw that he was having trouble sleeping and was standing on the top bunk of his bed, so they moved him to a padded cell for his safety. Then, in the early morning of August 17, 2012, an officer thought that Collins was having "bad [delirium tremens] from alcohol," and called Dr. Al-Shami. The doctor ordered that Collins be given some Librium immediately, and again each day for the next ten days. Later that morning, the doctor made his weekly visit to the jail and examined Collins in person. Dr. Al-Shami took Collins's pulse and listened to his heart, which were both normal (though Collins did appear jaundiced). Dr. Al-Shami also reviewed Collins's medical records (from both the jail and the recent hospital visit), and ordered that he be given a potassium supplement and sodium bicarbonate to treat his low potassium and high lactic-acid levels, respectively. Dr. Al-Shami believed that Collins was suffering from delirium tremens, but because Collins had just been released from the hospital, and because his condition had not changed since then, Dr. Al-Shami thought Collins's symptoms could be monitored and treated adequately by jail personnel.

Collins continued to display strange behavior, however. Late at night on August 19, Collins told an officer that Collins was "in a room of a house and [could not] fix it"; and a few hours later, in the early morning of August 20, jail staff overheard Collins talking to himself about two kids "going

around [and] stealing stuff." Collins refused to eat breakfast that morning, or lunch later that day—though by 10:30 PM, he was responsive and walking around his cell. Collins was still responsive on August 21, but on the morning of the 22nd, he spent several hours lying on the floor of his cell, at times disrobing, and would not eat any food. A nurse spoke with him and thought him capable of some coherent conversation, but noted that he had an unsteady gait, and so renewed the instruction for continuous monitoring. Jail officers began to observe Collins every fifteen minutes per the nurse's orders, and by lunchtime, Collins was eating once more. In the evening, Collins was still responsive but again tried to take his clothes off.

Officers continued to check on Collins every fifteen minutes, and Collins was sitting up and eating at 9:15 AM on August 23. Collins was still sitting up in his cell when officers checked on him again at 9:30 and 9:45 that morning; but when a nurse came by around 10:00 AM, she found that Collins's mental state had deteriorated. He was unable to converse with her or maintain eye contact, and he could not sit up or stand without help. The nurse called Dr. Al-Shami, who instructed her to send Collins back to the emergency room for further evaluation and lab work. The nurse complied, and Collins was taken to the hospital for a second time. Hospital staff determined that Collins was hypothermic (his body temperature was 84.2 degrees), that he had low blood pressure, and that he was suffering from dehydration, sepsis, and acute respiratory failure. Collins was treated at the hospital and remained there, in a medically-induced coma, for several days. He did not return to the jail.

In November 2013, Collins sued Dr. Al-Shami under Indiana common law and 42 U.S.C. § 1983, claiming that the doctor had been negligent and had violated Collins's Fourteenth Amendment rights. Collins also named as a defendant Dr. Al-Shami's employer, Advanced Correctional Healthcare, Inc., which had contracted with the Jackson County Sheriff's Department to provide physician services at the jail. Defendants[1] filed a motion for summary judgment, which the district court granted as to both the state-law and constitutional claims. Collins appeals.

## II. Discussion

We review de novo a district court's grant of summary judgment, construing all facts and drawing all reasonable inferences in favor of the non-moving party. *See Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 785 (7th Cir. 2017) (citation omitted). Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### A.  The Federal Claims

"[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody." *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 394–95, 395 n.10 (1989); *Belbachir v. Cty. of McHenry*, 728 F.3d 626, 628–30 (7th Cir. 2013)). The Fourth Amendment applies to the period of confinement between a

[1] Collins initially sued several employees of Jackson County and the City of Seymour, as well, but settled with those defendants in April 2015. The term "defendants," as used in this opinion, therefore refers only to Dr. Al-Shami and Advanced Correctional Healthcare.

warrantless arrest and the probable-cause determination, *id.* at 629, 631 (citations omitted); the Due Process Clause of the Fourteenth Amendment governs after the probable-cause determination has been made, *see Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006) (citations omitted); and the Eighth Amendment applies after a conviction, *id.* The parties in this case agree that Collins's federal claims are subject to the Due Process Clause, but disagree on what that Clause entails.

In the past, we have applied to due-process claims of inadequate medical care the deliberate-indifference standard derived from the Eighth Amendment. *See, e.g., Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1039 (7th Cir. 2012); *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). That standard includes both an objective and subjective component, *see Minix*, 597 F.3d at 831 (citations omitted), and thus is more difficult to satisfy than its Fourth Amendment counterpart, which requires only that the defendant have been objectively unreasonable under the circumstances, *see Lopez*, 464 F.3d at 718 (citing *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005)). Collins argues that under *Kingsley v. Hendrickson*, — U.S. —, 135 S. Ct. 2466 (2015), it is the objective-unreasonableness standard that governs here, *see id.* at 2473 (applying a "solely … objective" standard to a pre-trial detainee's claims)—but *Kingsley* was an excessive-force case, and we have not yet addressed whether its reasoning extends to claims of allegedly inadequate medical care, *cf. Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 n.31 (7th Cir. 2016). We need not (and do not) resolve that issue here, however, as even under the less-demanding standard, Collins's federal claims still cannot succeed.

1.  *The Claim Against Dr. Al-Shami*

Collins argues that the treatment he received from Dr. Al-Shami was objectively unreasonable under the circumstances, because Dr. Al-Shami did not monitor Collins's vital signs, or ensure that his vital signs were monitored, on a regular basis. In support of this argument, Collins points to the deposition testimonies of some of his other treating physicians, to a journal article on the evaluation and treatment of individuals suffering from alcohol withdrawal, and to an "Alcohol Withdrawal Protocol" issued by Dr. Al-Shami's employer, Advanced Correctional Healthcare. These materials do not demonstrate what Collins urges.

Dr. Guffey, the emergency-room doctor who treated Collins when he was first sent to the hospital on August 15, 2012, did refer to vital signs when asked at his deposition about diagnosing delirium tremens (an acute form of alcohol withdrawal). Patients suffering from delirium tremens, explained Dr. Guffey, typically will have a very high heart rate and a "fairly high" respiratory rate, and may have a higher-than-normal body temperature. However, Dr. Guffey also described more qualitative indicators of acute withdrawal, explaining that patients with delirium tremens will be "sweaty, very jittery, [or] shaking." Dr. Jonathan Light, who treated Collins after he returned to the same hospital on August 23, 2012, similarly described a collection or "cluster" of relevant symptoms, including, on the quantitative side, an elevated heart rate and hypertension (high blood pressure), but also including symptoms that may be observed or discovered through visual inspection or conversing with the patient, such

as tremulousness, agitation, confusion, severe anxiety, head-aches, hallucinations, diarrhea, vomiting, and excessive sweating.

Dr. Grant Olsen, an inpatient specialist who also treated Collins during his second hospital visit on August 23, like-wise discussed a comprehensive approach to diagnosing de-lirium tremens. While Dr. Olsen would often use vital signs to look for delirium tremens, he stated that, for inpatients, he would typically evaluate alcohol-withdrawal symptoms us-ing the Clinical Institute Withdrawal Assessment, or "CIWA," scale. The CIWA method, as explained in the journal article on which Collins also relies, *see* Max Bayard et al., *Alcohol With-drawal Syndrome*, 69(6) AM. FAM. PHYSICIAN 1325, 1443–50 (2004),[2] calls for healthcare providers to complete a worksheet that ascribes a numeric score to an array of symptoms typi-cally associated with alcohol withdrawal, such as nausea and vomiting; tremors; "[p]aroxysmal sweats"; anxiety; agitation; tactile, auditory, and visual disturbances; headaches; and dis-orientation and "clouding of sensorium." The more severe the symptom, the higher the score and, collectively, the higher the risk of developing delirium tremens. (The worksheet also in-cludes fields for recording the patient's heart rate and blood pressure, but ascribes a score to neither.)

Collins highlights that the Bayard article lists tachycardia (elevated heart rate), fever, and hypertension as specific indi-cia of delirium tremens. The article does mention those symp-toms in connection with severe alcohol withdrawal; but the article also refers to qualitative symptoms of the condition

---

[2] Available at http://www.aafp.org/afp/2004/0315/p1443.html (last visited March 20, 2017).

(*e.g.*, agitation, disorientation, and hallucinations), *id.* at Table 2. Vital signs are not the article's sole, or even primary, focus, and nothing in that document suggests that if a patient's vital signs are not measured frequently, healthcare providers will be unable to assess the severity of the patient's withdrawal.

Collins next points to the Alcohol Withdrawal Protocol created by Dr. Al-Shami's employer, Advanced Correctional Healthcare. The protocol suggests to jail personnel the actions they should take if they suspect a detainee might be suffering from withdrawal. These actions include: asking the detainee a series of questions (when the detainee last drank alcohol, how much they drink daily, and whether they have a history of liver disease or seizures); examining the detainee—*i.e.*, taking their "[v]itals" (blood pressure, temperature, pulse, and respiratory rate) and looking for other symptoms (*e.g.*, tremors, confusion) that might require treatment; recording the results of that examination; and scheduling a visit with a physician or "responsible medical provider." The protocol also states that, after treatment with any medication (as directed by a healthcare provider), the detainee's vital signs should be monitored every four hours for the first day of confinement, and then again during each shift while medications continue.

Collins argues that the protocol establishes a standard of medical care, and that the standard therefore includes the regular monitoring of a detainee's vital signs. On each page of the document, however, is written:

> These Protocols are designed to assist the staff in the gathering of information to be communicated to the medical staff. *The Protocols are not intended to establish a standard of medical care and*

> *are not standing orders*. All treatments must be or-
> dered and approved b[y] a Nurse Practitioner,
> Physician Assistant or Physician.

(emphasis added). Several jail employees also testified at their
depositions that the protocol forms are in general used by
non-medical jail staff for the limited purpose of collecting in-
formation when medical professionals are not present or
available to see detainees in person. At most, the protocol re-
flects the kind of data that some physicians[3] thought might be
helpful in assessing a detainee's alcohol withdrawal. The ma-
jority of those data concern the detainee's appearance and be-
havior, not his vital statistics, and in any event, there is no
suggestion that acute alcohol withdrawal cannot be treated or
diagnosed absent those particular statistics.

Vital signs aside, Collins argues that Dr. Al-Shami is still
liable under § 1983, because the on-site jail staff should have
at least monitored Collins's overall condition, and Dr. Al-
Shami did not advise those staff members about when to con-
tact him should Collins's symptoms worsen. This argument,
too, is unpersuasive. First, it is not apparent from the record
that Dr. Al-Shami was responsible for giving orders of pre-
cisely this kind. Moreover (and relatedly), Collins points to no
evidence reasonably suggesting that the orders Dr. Al-Shami
did give were deficient. Dr. Al-Shami instructed that Collins
be observed for signs of withdrawal (including sweating,
shaking, and changes in mental state), and Collins was
checked—frequently—by on-site personnel, who collectively
telephoned Dr. Al-Shami at least four times about Collins's

---

[3] The "[s]ource" of the protocol is listed as the "Physician Advisory
Board."

condition and twice sent him to the hospital at Dr. Al-Shami's request.

Collins stresses that Dr. Olsen was unable to assess the quality of care actually given to Collins during his detention because, according to Dr. Olsen, he did not have a complete "clinical picture" of Collins's condition. That Dr. Olsen could not opine on the adequacy of Collins's treatment is not evidence that the treatment was objectively *in*adequate—and nor do the records from Dr. Light, on which Collins also relies, fill that gap. Dr. Light had remarked in his treatment notes from August 28, 2012, that Collins's altered mental state was likely symptomatic of delirium tremens that had been "inadequately managed … with oral Librium at [the] jail." At his deposition, however, Dr. Light clarified that this comment was not about the relevant standard of care. According to Dr. Light, he had meant to convey only that, despite the Librium treatment (as ordered by Dr. Al-Shami), Collins's alcohol withdrawal had continued to progress—a possibility even where alcohol-withdrawal symptoms have been managed appropriately.

Defendants' medical expert, Dr. Benton Hunter, reviewed Collins's medical records and a chronology of his treatment at the Jackson County Jail, and concluded that Dr. Al-Shami's conduct was reasonable and in accordance with the applicable standard of care. Collins has not presented any evidence suggesting that this conclusion was erroneous. The district court thus correctly dismissed Collins's § 1983 claim against Dr. Al-Shami.

## 2. *The Claim Against Advanced Correctional Healthcare*

Collins argues that, if Dr. Al-Shami is liable under § 1983, Al-Shami's employer should likewise be held liable under the doctrine of *respondeat superior*. Under existing precedent, neither public nor private entities may be held vicariously liable under § 1983. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) (discussing municipal liability); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (extending *Monell* to suits against private corporations) (citations omitted). Though we have recently questioned whether the rule against vicarious liability should indeed apply to private companies, *see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 786, 789–95 (7th Cir. 2014), we again leave that question for another day. Dr. Al-Shami is not liable, so—even if the theory of *respondeat superior* were available—neither is his employer.

### B. The State-Law Claims

Collins also brought a medical-malpractice claim against Dr. Al-Shami and Advanced Correctional Healthcare under Indiana law. (There is no dispute that *respondeat superior* applies in Indiana.) To succeed on such a claim, Collins must show that Dr. Al-Shami owed Collins a duty of care, that the doctor's actions did not conform to that standard of care, and that Collins was proximately injured by the doctor's breach. *See McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 910 (Ind. 2009).

Collins seeks to avoid summary judgment on his state-law claims using the same evidence he presented in support of his § 1983 claims. That evidence, however, for reasons already discussed, is insufficient to create a genuine issue of material

fact. The state-law claims against Dr. Al-Shami and Advanced Correctional Healthcare were correctly dismissed.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.